# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  March 13, 2014

Mr. Richard Oluremi Cherry
Kalamazoo City Attorney's Office
241 W. South Street, Ste. 301
Kalamazoo, MI 49007

Mr. Mark Laster
3413 Mt. Olivet Rd.
Kalamazoo, MI 49004

Re:  Case No. 13-1640, *Mark Laster v. Kalamazoo, City of, et al*
Originating Case No. : 1:11-cv-01061

Dear Mr. Laster and Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Tracey Cordes

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MARK LASTER,

              *Plaintiff-Appellant*,

    *v.*

CITY OF KALAMAZOO, et al.

              *Defendants-Appellees*.

No. 13-1640

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
No. 1:11-cv-01061—Janet T. Neff, District Judge.

Decided and Filed:  March 13, 2014

Before:  BATCHELDER, Chief Judge; SILER and CLAY, Circuit Judges.

———————————

### COUNSEL

**ON BRIEF:**  Richard O. Cherry, KALAMAZOO CITY ATTORNEY'S OFFICE, Kalamazoo, Michigan, for Appellee.  Mark Laster, Kalamazoo, Michigan, pro se.

    CLAY, J., delivered the opinion of the court, in which BATCHELDER, C.J., and SILER, J., concurred.  BATCHELDER, C.J. (pg. 23), delivered a separate concurring opinion.

———————————

### OPINION

———————————

    CLAY, Circuit Judge.  Plaintiff Mark Laster appeals the district court's order granting summary judgment in favor of Defendants, the City of Kalamazoo and several named individuals, on Plaintiff's race discrimination and retaliation claims.  In his Complaint, Plaintiff alleges, *inter alia*, that Defendants violated 42 U.S.C. § 2000e-3(a) *et seq.* ("Title VII"), MICH. COMP. LAWS § 37.2101 *et. seq.* ("Elliot-Larsen Civil Rights Act"), and 42 U.S.C. § 1983. Specifically, Plaintiff alleges that he was "constructively discharged against his will" and

experienced "other adverse job actions" based on racial discrimination and in retaliation for his various complaints of racial discrimination.

For the reasons discussed below, we agree with the district court's conclusion that Plaintiff has not established that he was constructively discharged, and, consequently, that Plaintiff has not shown any "adverse employment action" for the purposes of his Title VII race discrimination claim.   However, we find that the district court improperly analyzed—and improperly dismissed—Plaintiff's Title VII retaliation claim.

The district court analyzed Plaintiff's claims only in the context of "Race Discrimination" and "First Amendment Retaliation," but Plaintiff's Complaint, which alleges that Plaintiff experienced "adverse job actions" in "retaliation for prior [discrimination] complaints" and in "violation of 42 USC 2000e-3(a)*, et. seq.*," clearly raises a Title VII retaliation claim.   The district court's analysis of Plaintiff's First Amendment retaliation claim (brought pursuant to 42 U.S.C § 1983) does not obviate the need to analyze Plaintiff's Title VII retaliation claim because the type of activity protected by the First Amendment is different than the type of activity protected by Title VII.   Moreover, the district court's analysis of Plaintiff's Title VII race discrimination claim does not provide a sufficient basis for dismissing his Title VII retaliation claim because the two claims have different elements.   The "materially adverse action" element of a Title VII retaliation claim is substantially different from the "adverse employment action" element of a Title VII race discrimination claim.   *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007).   Under the former, Plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57 (internal quotation marks and citations omitted).   The fact that Plaintiff cannot show that he was constructively discharged is not dispositive of Plaintiff's Title VII retaliation claim where Plaintiff has provided evidence of other adverse actions which raise a genuine issue of fact as to whether or not they satisfy this standard.

For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

## BACKGROUND

Plaintiff is an African American male who worked as a Public Safety Officer/Emergency Officer ("PSO/EO") for the Kalamazoo Department of Public Safety ("KDPS") for more than twenty-three years. Plaintiff claims that throughout his employment, he was treated less favorably than similarly-situated co-workers. Specifically, Plaintiff alleges that KDPS subjected Plaintiff to heightened scrutiny, selectively enforced policies against Plaintiff, and was complicit when individual employees harassed and discriminated against Plaintiff.[1] Plaintiff alleges that such disparate treatment was attributable, at least in part, to Plaintiff's race or to his complaints about discrimination.

In his briefing before this Court, Plaintiff contends that the below enumerated instances of disparate treatment establish the fourth and final prong of his *prima facie* Title VII discrimination claim: that Plaintiff was treated less favorably than similarly situated individuals outside of the protected class. We note, however, insofar as Plaintiff alleges that the unfavorable treatment was retaliation for Plaintiff's filing discrimination complaints, some of these same alleged events also establish the "materially adverse action" element of Plaintiff's Title VII retaliation claim. Plaintiff alleges that each of the following was attributable, at least in part, to Plaintiff's race or to his complaints about discriminatory treatment:

1. **Evaluation Downgrade.** On May 1, 2007, Sergeant Vernon Coakley informed Plaintiff that he was changing Plaintiff's 2006 performance evaluation from "satisfactory" to "needs improvement." Plaintiff complained to Coakley's direct supervisor, Captain Uridge, but Uridge was "complicit in his response." Later, when Plaintiff went to the KDPS Administration office to review his personnel file, he was told that it was missing, and that Coakley was the last person to have had access to it. After Plaintiff filed a formal grievance contesting the improper evaluation downgrade, KDPS reversed the downgrade and changed Plaintiff's evaluation back to "satisfactory."

2. **Request to Attend Outside Training Program Denied.** On December 19, 2008, Plaintiff submitted a written request to attend the Fire Department Instructor's

---

[1] Plaintiff alleges generally that he "suffered racist slurs and other demeaning racial epithets constantly from his co-workers (white) and despite complaints from [P]laintiff to superiors . . . [who] took [no] action to correct [the] behavior [and] allowed such disrespectful conduct to continue."

Conference ("FDIC") for two days in Indianapolis, Indiana.   Plaintiff was the first employee from KDPS to request to attend that training program.   Plaintiff's request was denied, and no reason was given.   Approximately two weeks later, two Caucasian employees were granted permission to attend the FDIC for five days, with all of the costs of their trip paid in full.   After learning that his two Caucasian co-workers were approved for a five-day, all-expense-paid trip to attend the program, Plaintiff re-applied.   Plaintiff's second application—again requesting permission to attend the FDIC for two days—was approved with the condition that Plaintiff pay fifty percent of his own expenses: four hundred dollars.   Plaintiff's Caucasian co-workers were not required to pay any portion of their own expenses for their five-day trip.   Plaintiff asserts that Defendants' proffered reasons for the difference in treatment are pretextual, and offers evidence to negate each stated reason.

3.   **Request to Use Meeting Room Denied.**   On or about February 12, 2009, Plaintiff submitted a written request to use the large meeting room at the fire station for two hours on February 22, 2009 to host a birthday party for his one-year-old daughter.   Although the meeting room was not scheduled to be occupied on the requested date, Plaintiff's request was denied.   Plaintiff has produced affidavits to show that the same meeting room has been approved at other times for KDPS employees to host non-work-related events such as "seminars that contained religious themes and speech," "retirement parties that included KDPS personnel and non-KDPS civilians," and school tours for children.

4.   **Not Invited to Meeting on July 1, 2009.**   On July 1, 2009, Plaintiff was not informed about a department meeting hosted by Sergeant VanDerWiere to obtain input from KDPS personnel regarding the prospective purchase of a new fire truck.   Plaintiff was the only person on the shift who was not invited to the meeting.   One of Plaintiff's co-workers, Richard LeRoy, called Plaintiff via cell phone while in the meeting to inform Plaintiff of the meeting in progress.   Plaintiff arrived shortly thereafter and participated in the meeting.   During the meeting, VanDerWiere reprimanded both Plaintiff and LeRoy for "being rude" and disruptive when they opined that it was unnecessary to purchase a new fire truck instead of updating the existing trucks.

5. **Memorandum of Counseling and Suspension**. After the July 1, 2009 meeting, VanDerWiere wrote a memorandum to KDPS administrators, in which he stated that both Plaintiff and LeRoy (a Caucasian employee) were disrespectful and disruptive at the meeting. In the memorandum, VanDerWiere "states that LeRoy was the more egregious and disruptive person in the meeting." On April 29, 2009, Plaintiff received a Memorandum of Counseling accusing Plaintiff of violating two general order provisions in the July 1, 2009 meeting. Plaintiff was suspended for two days without pay. LeRoy, on the other hand, was never disciplined in any way. After Plaintiff complained of the disparate treatment, the two-day suspension was revoked.

6. **E-mail Regarding Children's Playset.** On June 22, 2009, VanDerWiere told Plaintiff that Plaintiff had to remove a collapsible play set that Plaintiff kept in the station's storage room for his young children to use when they visited him at work. VanDerWiere told Plaintiff that it was a violation of General Order G-133 to store personal property at the station. In response, Plaintiff asked if he could store the play set in the storage room where Doug Deikman, a Caucasian employee, stored his large, personally-owned freezer containing meat from Deikman's privately-owned farm. VanDerWiere replied that Plaintiff could not store the play set anywhere in the station.

7. **Reprimand for Violating Firearm Policy.** On April 27, 2009, Sergeant Mark Johncock directed Plaintiff to wear his firearm at all times while on duty. Captain Uridge had told Johncock to communicate this directive specifically to Plaintiff. In the following days, Johncock and Plaintiff spoke several times regarding the firearm policy, which Plaintiff believed was being selectively enforced. The contact between Johncock and Plaintiff found its way into the daily activity report ("DAR") prepared by Johncock for April 29, 2009. Plaintiff was led to believe that a copy of the DAR was placed into Plaintiff's personnel file, although that was later found to be false.

8. **Anti-Obama Screen Saver.** On March 26, 2010, Plaintiff entered the Report Room to utilize a common computer. Thereon, he saw that somebody had uploaded and set as a screen saver a photo of a dog urinating on an Obama campaign sign with the caption "Good Boy!" Plaintiff felt that this was a personal attack on him because Plaintiff had proudly displayed a photograph of his family with President Barack Obama to

approximately 150 KDPS personnel during the prior week.   Plaintiff reported the incident, but felt that it was never properly investigated.  Plaintiff alleges that KDPS

> never investigated the matter, never inquired as to who utilized the computer that day, never conducted a forensic evaluation of the computer to see who was using the computer during the time the political photo was uploaded . . ., [and] never even inquired of any KDPS personnel to see who had [harassed Plaintiff and] violated KDPS policy that . . . prohibit[s] the uploading of such . . . materials.

9.   **Reprimand for Failure to Fill Air Bottle.**  In May 2010, Plaintiff inadvertently failed to fill a Scott air bottle during his inspection of a fire truck.  The operator who noticed Plaintiff's small error reported the offense, and Plaintiff was reprimanded.  Typically, when an equipment operator finds something that needs attention (*e.g.*, top off an air bottle), it is customary practice "to simply perform the duty missed/neglected by the prior shift without the necessity of formally reporting said offense to superior officials." However, the employee who noticed Plaintiff's error reported the offense because he had been instructed to "report anything he saw [Plaintiff] doing wrong to a supervisor immediately."   According to Union Representative Laura Misner, it "appeared that [Plaintiff] was being singled-out for formal reprimand for failure to comply with this policy/procedure or for any future incidents which may be routinely and customarily ignored by fellow KDPS . . . employees."

10.   **Heightened Scrutiny.**  In early 2010, KDPS employee Jeffery Malcolm stated in the presence of Misner that he was given a direct order to immediately report any wrongdoing by Plaintiff to KDPS Inspector of Professional Standards Vernon Coakley or to any other superior administrator within KDPS.  In addition, Plaintiff was personally informed that Defendant Hemmingway was "pushing hard for Plaintiff to be disciplined" on a "minor issue" involving Plaintiff's inadvertent failure to service equipment used during a training exercise on May 26, 2010.

11.   **Threat in HR Training Session.**  In May 2010, in a mandatory human resources training session on discrimination, Deputy Chief Samuel Harris allegedly turned toward the classroom attendees, which included Plaintiff, and said: "No one from this department better make a report to the EEOC without first coming to me."

Plaintiff reported many of the aforementioned instances of perceived harassment, racial discrimination, and retaliation.  On June 24, 2007, Plaintiff filed a harassment complaint form with the City of Kalamazoo Department of Human Resources, complaining about the evaluation downgrade.  Plaintiff expressed in his complaint that he felt "tormented, harassed, and believe[d the named incidents were] a personal and professional attempt to destroy [his] career, with the intended effect to make [him] quit or get fired."  On April 2, 2009, Plaintiff filed another complaint with human resources alleging harassment and discrimination based on race.  Specifically, he cited the denial of his request to attend the outside training program as well as the denial of his written request to use the unoccupied meeting room.  Plaintiff asserted that the denial of both requests was, at least in part, because Plaintiff is African American.  On May 4, 2009, Plaintiff filed yet another complaint with human resources alleging harassment and discrimination based on race and retaliation for filing the earlier complaints against some of his superior officers.  Plaintiff's May 2009 complaint focused on the reprimand Plaintiff received on April 27, 2009 for violating the firearm policy.

On June 11, 2009, dissatisfied with the outcome of the internal grievance procedure, Plaintiff filed a Charge with the EEOC complaining of racial discrimination and retaliation by Plaintiff's employer, KDPS.  Plaintiff complained of disparate treatment in the workplace, citing five of the aforementioned instances of discrimination and retaliation: 1) the denial of Plaintiff's request to attend outside training program; 2) the denial of Plaintiff's request to use the meeting room; 3) the Memorandum of Counseling and suspension following the VanDerWiere meeting; 4) the accusation of Plaintiff's violation of general order G-133 for storing personal property at station; and 5) the failure to invite Plaintiff to the July 1, 2009 meeting.  Plaintiff complained of "overt" and "systemic" racism, and explained that he was "being subjected to disparate treatment, retaliation, and a hostile work environment based upon . . . race."

On February 5, 2010, the EEOC issued its determination and proposed conciliation agreement.  The EEOC indicated that "there is reasonable cause to believe Charging Party's allegations are true."  The proposed conciliation agreement directed Defendant KDPS to do five things: 1) send Plaintiff to the next outside training available; 2) pay Plaintiff $20,500; 3) allow Plaintiff to store personal items at the fire station; 4) remove a Memo of Counseling from Plaintiff's personnel file; and 5) provide city staff with appropriate training with an emphasis on

race.  Defendants did not agree to the terms of the proposed conciliation, and the matter was referred to the Department of Justice ("DOJ").

On July 19, 2010, Plaintiff filed a second Charge with the EEOC.  Plaintiff alleged that he was "retaliated against and further subjected to harassment and intimidation within [his] department, to which he complained to management, to no avail."  In particular, he described the incident of March 26, 2010 in which he was "subjected to a racist display of a dog urinating on a President Obama campaign sign found on a city computer."  The matter was referred to the DOJ, and on October 28, 2010, the DOJ issued a "right to sue within 90 days" letter for Case 471-2010-02663.  Two weeks later, on November 8, 2010, the DOJ issued Plaintiff a "right to sue within 90 days" letter for Case 471-2009-02289.

In the meantime, in June 2010, President Barack Obama was the guest speaker at the Kalamazoo Central High School commencement ceremony which was held at Western Michigan's Field House.  To ensure the President's safety, KDPS positioned police personnel at all entrances.  Plaintiff was not among those officers who were on duty that day.  Rather, Plaintiff had acquired four tickets to attend the commencement with his family.

Plaintiff attended the commencement along with his wife and two daughters on June 7, 2010.  Plaintiff contends that he had ascertained a permissible parking location in advance from a Western Michigan Public Safety Officer.  According to Plaintiff, he parked in the indicated parking location without incident, and did not have any negative interactions with KDPS personnel, Secret Service, or any other individuals or law enforcement officers.  According to Defendants, Plaintiff "crashed" his vehicle into a police car and left the scene of the accident, "negatively engaged with supervisory officers," and tried to make an unauthorized entry into the area where the President of the United States was seated.  Defendants contend that "Plaintiff entered the building and engaged in a series of acts that may have constituted violations of either law or department policy and rules."

KDPS began an internal investigation into possible wrongdoing by Plaintiff.  During the investigation, KDPS interviewed Plaintiff and various employees who either interacted with or observed Plaintiff that day.  Each witness submitted varying factual encounters of the incident, but the investigation resulted in no conclusive findings that Plaintiff had been drinking or was intoxicated.

Plaintiff has submitted various affidavits, including his own, suggesting that Defendants' version of the events is "absolutely incredible," and that Defendants obtained false, accusatory reports because it is the "culture" of KDPS for officers to provide memoranda in the style of a police report when asked.  Plaintiff submits that it is simply not possible that on-duty Public Safety Officers and Command would have allowed Plaintiff to sit within 30–50 feet of President Barack Obama if Plaintiff was noticeably intoxicated.  Plaintiff further submits that a Public Safety Officer would have arrested, detained, or investigated Plaintiff if they believed that they had observed Plaintiff committing a felony in their presence.  Plaintiff was not investigated, detained, or arrested on June 7, 2010, and was indeed permitted entry into the building, where he sat near President Obama and took a photograph with him.

In August 2010, when KDPS had concluded its internal investigation into Plaintiff's alleged wrongdoing, Plaintiff and Union Representative Laura Misner were provided with notice that Plaintiff would have a "pre-determination hearing" on September 2, 2010.  Pursuant to Plaintiff's collective bargaining agreement, a pre-determination hearing (*i.e.*, an opportunity to explain or defend the conduct before KDPS makes a determination as to what disciplinary action, if any, to take) is necessary whenever an officer's conduct gives rise to the possibility of disciplinary actions.

Prior to the scheduled pre-determination hearing, Plaintiff was advised that if he were terminated, he would not be eligible for health insurance benefits for his dependents—including his pregnant wife and two young children—and his retirement package would be deferred.  Plaintiff was extremely concerned about losing health insurance benefits for his family.

On September 2, 2010, the morning of Plaintiff's pre-determination hearing, Plaintiff spoke with Michael McCaw, a KDPS employee who had previously served as assistant chief and deputy chief of KDPS.  Plaintiff sought McCaw's opinion, based in part on McCaw's tenure as an administrator at KDPS, as to what McCaw believed would occur to him during the pre-determination hearing scheduled for Plaintiff on that date.  It is undisputed McCaw did not know what disciplinary action, if any, the administrators overseeing the pre-determination hearing were planning to take, and that McCaw did not have any input in the disciplinary action.  However, McCaw told Plaintiff that he had heard rumors that co-defendant Deputy Chief Sam Harris was conducting the pre-determination  hearing  and  that

Harris had made statements to KDPS personnel (but not to McCaw), and to Officer Craig Johnson in particular, to suggest that Harris would be terminating Plaintiff from his employment with KDPS at the conclusion of the pre-determination hearing.  McCaw attests that he told Plaintiff that he *believed* (but did not *know*) that Plaintiff would be terminated at the conclusion of the pre-determination hearing on September 2, 2010.

McCaw also told Plaintiff that if Plaintiff were terminated, Plaintiff could challenge the termination through the grievance procedure outlined in the collective bargaining agreement while collecting his pension benefits.  In response, Plaintiff informed McCaw that if he were terminated, he would not receive health insurance for his dependents.  Plaintiff "was specifically concerned that his [pregnant] wife and his daughters would not be covered by health insurance if he were terminated."  Plaintiff indicated to McCaw that he could not risk having his wife and children uninsured and he was, therefore, considering retiring in order to secure the health insurance benefits.  McCaw was skeptical about the accuracy of the information about the health insurance benefits, and encouraged Plaintiff to confirm that information.

Pursuant to McCaw's advice, Plaintiff inquired with Union Representative Laura Misner whether it was true that he would lose insurance coverage if he were terminated.  Misner confirmed the information with the Department of Human Resources Benefits Specialist. Plaintiff has presented an e-mail sent from the Benefits Specialist to Misner confirming Plaintiff's belief that terminated employees are not eligible for health insurance coverage.  It is now undisputed that this information was inaccurate, and that Plaintiff would not have lost health insurance coverage if he were terminated.  However, Plaintiff has not produced any evidence that this misinformation was intentional, and does not allege that the misinformation was given with any discriminatory or retaliatory intent.

After confirming his (mistaken) belief that his health insurance would be terminated if he were to be fired, Plaintiff spoke with McCaw again on the morning of September 2, 2010. In this conversation, McCaw informed Plaintiff that he had spoken to Assistant Chief Uridge. McCaw indicated that his belief that Plaintiff would be terminated at the conclusion of the pre-determination hearing had not changed, but that McCaw believed that Plaintiff's retirement could be arranged, avoiding the hearing and termination.

Plaintiff did not attend the pre-determination hearing.  Instead, he submitted a letter of resignation on September 2, 2010.  Because Plaintiff resigned after twenty-three years of service, he was entitled to only a partial pension, and not his full pension, for which employees become eligible after twenty-five years of service.

On September 3, 2010, Rex Hall, a staff writer for the Kalamazoo Gazette newspaper, submitted to the City a request pursuant to the Freedom of Information Act ("FOIA"), MICH. COMP. LAWS 15.2312 *et. seq.*, relating to the "internal investigation" of Plaintiff's conduct at the graduation.  City Attorney Clyde Robinson claims that he sent Plaintiff a letter advising him of the FOIA request, but Plaintiff claims that he never received a letter.  On October 5, 2010, Hall submitted another request for "a copy of the Kalamazoo Department of Public Safety personnel file of Officer Mark Laster."  Robinson claims he sent another letter to Plaintiff, but Plaintiff claims that he did not receive this letter either.  On January 6, 2011, Robinson released the requested documents to the Kalamazoo Gazette.

Defendants assert that prior to releasing any documents to the Gazette, Robinson reviewed each page for possible withholding or redactions, and that Robinson redacted information from approximately 100 of the 363 pages released.  Robinson attested that he intended to redact any mention of Plaintiff's home address; however, Robinson inadvertently failed to redact the address on two documents.  Robinson also claims that he decided not to redact the names of Plaintiff's wife and mother after Robinson applied the balancing test set forth in the FOIA and concluded that the public interest in disclosure outweighed the interest in nondisclosure.

On January 16, 2011, the Kalamazoo Gazette published an article describing the alleged incident involving Plaintiff at the graduation attended by President Obama, and included a link to a PDF of the released documents.  Plaintiff claims that he was humiliated by the article and by the publication of his personnel file, and feels that his private information was released in retaliation for his filing Charges with the EEOC with the intent to intimidate or dissuade him from filing a federal complaint.

On October 4, 2011, Plaintiff timely filed a five-count Complaint in the United States District Court for the Western District of Michigan alleging, among other things, that Defendants violated Plaintiff's civil rights under Title VII by engaging in discriminatory conduct that led to

Plaintiff's constructive discharge.  Plaintiff also alleged that Defendants retaliated against him for exercising rights protected by Title VII and the First Amendment.

On March 18, 2012, Defendants filed a motion for summary judgment and dismissal. Plaintiff filed a responsive brief, which contained a counter-statement of material facts as well as thirty-eight exhibits (over 500 pages) in support of his position.  The district court granted Defendants' motion without oral argument.  Plaintiff timely filed a notice of appeal.

## DISCUSSION

We review the district court's grant of summary judgment *de novo.  See Kalich v. AT&T Mobility, LLC,* 679 F.3d 464, 469 (6th Cir. 2012); *DePiero v. City of Macedonia,* 180 F.3d 770, 776 (6th Cir. 1999).  Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestlé USA, Inc.,* 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  Once Defendants meet their burden of production, Plaintiff, as the nonmoving party, must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial.  *Id.*

We must accept Plaintiff's evidence as true and draw all reasonable inferences in his favor.  *See Anderson,* 477 U.S. at 255; *Martin v. Cincinnati Gas and Elec. Co.,* 561 F.3d 439, 443 (6th Cir. 2009); *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).  Like the district court below, we may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial.  *Logan v. Denny's, Inc.,* 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil,* 188 F.3d 365, 369 (6th Cir. 1999).

## I.       Race Discrimination Claims

Title VII provides that it shall be unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the Elliot-Larsen Civil Rights Act prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race."  MICH. COMP. LAWS § 37.2202(1)(a).  The *prima facie* requirements for a discrimination case are the same under Michigan law and federal law.  *See Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003).

A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination.  *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 348 (6th Cir. 1997).  Where, as here, the claim is based on circumstantial evidence, we employ the burden-shifting framework set forth in *McDonnell Douglas*.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973); *see also Tex. Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53 (1981) (clarifying *McDonnell Douglas* burden-shifting framework).

Under *McDonnell Douglas*, Plaintiff first carries the burden of establishing a *prima facie* case.  411 U.S. at 802.  To establish a *prima facie* case of discrimination under both Title VII and the Elliot-Larsen Civil Rights Act, Plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. [2]  *See Logan*, 259 F.3d at 567; *Mitchell v. Toledo Hosp.,* 964 F.2d

---

[2]As we recognized in *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 796 n. 1 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006), "Although this court and most other courts use the term 'adverse employment action,' some courts, including the Supreme Court, use the term 'tangible employment action' or some other variation for the same concept."

We also note that a plaintiff may succeed on a Title VII discrimination claim without showing the existence of an adverse employment action by showing that he "was subjected to severe or pervasive . . . [discriminatory] harassment by a supervisor." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  However, Plaintiff does not allege—and the facts of this case do not suggest—that such pervasive harassment existed at KDPS.

577, 582 (6th Cir. 1992).  The parties agree that Plaintiff has satisfied the first two elements, but dispute whether Plaintiff has met the third element.

In the context of a Title VII discrimination claim, an adverse employment action is defined as a "materially adverse change in the terms or conditions" of employment.  *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Adverse employment action "requires an official act of the enterprise, a company act.  The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors."  *Id*. at 762.  In addition, it typically "inflicts direct economic harm." *Id.*

Plaintiff alleges that he suffered an adverse employment action when he was "constructively discharged" on September 2, 2010.  *See Kocsis,* 97 F.3d at 886 (employee may establish an adverse employment action by demonstrating that he was constructively discharged).  Plaintiff also suggests that he suffered "other adverse employment actions," but fails to specify what, precisely, those other adverse employment actions were.  Plaintiff's two-day suspension does not meet the standard of an "adverse employment action" since it was ultimately revoked.  In addition, we agree with the district court's conclusion that Plaintiff's resignation did not amount to a constructive discharge.

"A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'"  *Lopez v. S.B. Thomas, Inc*., 831 F.2d 1184, 1188 (2d Cir. 1987) (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325–26 (2d Cir. 1983) (quoting *Young v. Southwestern Sav. and Loan Ass'n,* 509 F.2d 140, 144 (5th Cir. 1975))).  To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.  *Saroli v. Automation and Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005); *Logan*, 259 F.3d 568.

In *Logan*, we formally adopted the Fifth Circuit's approach to determining whether the first prong of the constructive discharge inquiry has been met, counseling that:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Although Plaintiff has presented some evidence that he was subjected to heightened scrutiny and treated differently than his non-minority peers, he has not presented any evidence that this behavior was undertaken with the specific intention of forcing Plaintiff to quit. Indeed, Plaintiff ultimately resigned not because of the "intolerable" working conditions, but because he received bad information. Upon review of the evidence, it appears that this informational error was inadvertent and was not intended to force Plaintiff to quit. Simply put, Plaintiff has not adduced sufficient evidence to show that Defendants *deliberately* created intolerable working conditions with the *intention* of forcing Plaintiff to quit.

However, as the Seventh Circuit explained in *E.E.O.C. v. University of Chicago Hospitals*, constructive discharge can take on two different forms:

> We are ordinarily faced with a situation in which the employee only alleges that she resigned because of *discriminatory harassment*, and in such cases, we require the plaintiff to demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment.
> But that is not the only method of demonstrating constructive discharge. *When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge.*

276 F.3d 326, 331–32 (7th Cir. 2002) (internal citations and quotations omitted) (emphasis added); *see also Burks v. Oklahoma Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("An

employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired.").  In other words, constructive discharge also occurs where, based on an employer's actions, "the handwriting was on the wall and the axe was about to fall."  *Univ. of Chicago Hosp.*, 276 F.3d at 332 (internal quotations and citation omitted); *see generally Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired.").

In the instant case, it is undisputed that Plaintiff was not directly told that he would be terminated at the pre-determination hearing.  McCaw speculated that it seemed likely that Plaintiff would be terminated at the hearing, but there is nothing in the record to indicate that KDPS actually communicated as much to Plaintiff.  McCaw had no say in the decision-making process, and was not privy to any inside information regarding the definite outcome of the hearing.  This situation is distinguishable from the cases in our sister circuits that have found constructive discharge where a Plaintiff quits in order to avoid being fired.  *See, e.g., Lopez*, 831 F.2d at 1188 (genuine issue of material fact as to whether employee was constructively discharged where a supervisor told employee that he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance).  Consequently, Plaintiff has not raised a genuine issue of material fact regarding whether or not his resignation was a constructive discharge.

Because we conclude that Plaintiff cannot establish a *prima facie* case of discrimination, we need not proceed to the remaining steps of the *McDonnell Douglas* analysis, and we agree that Plaintiff's Title VII discrimination claim and related state law claims were properly dismissed.

## II.     Title VII Retaliation Claim

In his Complaint, Plaintiff also alleges that he was "constructively discharged against his will and experienced other adverse job actions" in retaliation for the discrimination complaints that Plaintiff raised with his employer and filed with the EEOC, and that this was a violation of Title VII.  Although Plaintiff clearly raised a Title VII retaliation claim, the district court failed

to analyze it as such.[3]  Instead, the district court only analyzed whether Plaintiff had established a *prima facie* case of discrimination under Title VII and whether Plaintiff was entitled to relief under § 1983 for retaliation in violation of Plaintiff's First Amendment rights.  The district court dismissed Plaintiff's Title VII claim after concluding that Plaintiff was not constructively discharged, and dismissed Plaintiff's First Amendment claim after concluding that "Plaintiff's EEOC charge[s] did not encompass matters of public concern," and Plaintiff therefore "has not identified any constitutionally protected speech."   Because the district court misconstrued Plaintiff's Complaint and improperly analyzed Plaintiff's Title VII retaliation claim, and because Plaintiff has raised a genuine issue of material fact as to whether or not Defendants retaliated against him in violation of Title VII, dismissal of this claim was improper.

Title VII prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII.  *See* 42 U.S.C. § 2000e-3(a).  The opposition clause of Title VII makes it "unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because he has opposed any practice made . . . unlawful . . . by this subchapter." § 2000e–3(a).  "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning, 'to resist or antagonize [. . .]; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1958)).  The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.  *See Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation.") (citing *Michael*, 496 F.3d at 595); *Hill v. Air Tran Airways*, 416 F. App'x 494, 498 (6th Cir. 2011); *Shepard v. Uniboring*, 72 F. App'x 333, 336 (6th Cir. 2003)).  Thus, in addition to the Charges that Plaintiff filed with the EEOC, we must also consider the harassment

---

[3]Because the district court mistakenly analyzed Plaintiff's retaliation claim under the First Amendment framework, and because Plaintiff is representing himself *pro se* on appeal, neither party correctly articulated the issue before this Court on appeal.  However, Plaintiff has certainly not waived his Title VII retaliation claim.  In his Complaint as well as his briefing before the district court and this Court, Plaintiff continues to argue that Defendants violated his rights under Title VII by retaliating against him for complaining about discrimination in the workplace.

complaints that Plaintiff filed internally with human resources to be protected activities under Title VII.[4]

As with a Title VII discrimination claim, a Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 538 (6th Cir. 2008).  Here, Plaintiff has done the latter.  Therefore, we analyze Plaintiff's retaliation claim under the burden-shifting framework of *McDonnell Douglas*.  411 U.S. 792.

Under *McDonnell Douglas*, Plaintiff bears the initial burden to establish a *prima facie* case of retaliation.  If Plaintiff succeeds in making out the elements of a *prima facie* case, "the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions.  If the defendant satisfies its burden of production, the burden shifts back" to Plaintiff to demonstrate that Defendants' proffered reason was not the true reason for the employment decision.  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quotation marks and citations omitted).  "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process."  *Id.*

The elements of a retaliation claim are similar but distinct from those of a discrimination claim.  To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action."  *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003), and *Burlington N.*, 548 U.S. at 67–68 (modifying the third element to require a "materially adverse action" rather than an "adverse employment action")).[5]  Title VII retaliation claims "must be proved according to

---

[4] The district court erred in considering only the formal Charges the Plaintiff filed with the EEOC, and in concluding that

> Plaintiff's second EEOC Charge filed in August 2010 cannot properly form the basis of his [retaliation] claim where the City had already completed its investigation of Plaintiff's conduct at the graduation and the only 'action' the City took after the filing of the second EEOC Charge was the scheduling of the Predetermination Hearing.

[5] As with a Title VII discrimination claim, Plaintiff can alternatively establish this element by showing that he "was subjected to severe or pervasive retaliatory harassment by a supervisor."  *Michael v. Caterpillar Fin. Servs.*

traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

The parties do not seem to dispute that Plaintiff has established the first two elements. The parties dispute whether Defendants took any materially adverse actions against Plaintiff, and, if so, whether there was a causal connection between a protected activity and such action.

Plaintiff alleges:

> as a result of [P]laintiff reporting various acts of misconduct by [KDPS] administrators/personnel, [P]laintiff became the object of their disdain, distrust and contempt causing said administrators to retaliate against [P]laintiff by heightened/increased monitoring and surveillance as ordered by KDPS administrators; trumping up bogus allegations to support disciplinary hearings, where prior to the hearing, it was already predetermined that [P]laintiff was going to be terminated . . . .

Plaintiff also alleges that "after [P]laintiff's forced resignation, knowing that he would likely file a civil rights lawsuit against the City/KDPS, co-defendant Clyde Robinson, the City Attorney and FOIA Coordinator, released [P]laintiff's entire personnel file," which was subsequently uploaded to the Kalamazoo Gazette/MLive.com website "for the world to see his personal and private and/or privileged information."

Plaintiff's burden of establishing a materially adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." *Michael*, 496 F.3d at 595–96 (citing *Burlington N.*, 548 U.S. at 67–71).   Unlike a Title VII discrimination claim, "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington N.*, 548 U.S. at 57.  To establish the third element of the *prima facie* Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks and citations omitted).  In analyzing the significance of any given act of retaliation, "[c]ontext matters.  'The real social impact of

---

*Corp.*, 496 F.3d 584, 595 (6th Cir. 2007) (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Id.* at 69 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998)). "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* at 82 (citing 2 EEOC 1998 Manual § 8, p. 8–14). "An act that would be immaterial in some situations is material in others." *Id.* (citation omitted). "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Michael*, 496 F.3d at 596 (holding that placing employee on brief paid administrative leave and 90-day performance plan meet "relatively low bar" of materially adverse action for purpose of retaliation claim); *see also Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 432 (6th Cir. 2007) (remanding for reconsideration, in light of *Burlington Northern*, whether assigning the plaintiff a poor performance-evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim).

In the instant case, Plaintiff has presented evidence that after filing a complaint with human resources in 2007 regarding what he felt was a racially discriminatory action, Plaintiff was denied training opportunities and privileges, singled out for violating at least two department policies that were selectively enforced against him, and disciplined more harshly than his peers for identical violations. In addition, the evidence viewed in the light most favorable to Plaintiff supports Plaintiff's allegation that KDPS initiated a frivolous and malicious investigation of Plaintiff following the June 7, 2010 incident. Plaintiff further alleges that he complained about harassing, discriminatory, and retaliatory conduct by his co-workers, and that KDPS did not take any corrective action. We note that "[i]n appropriate circumstances, Title VII permits claims against an employer for coworker retaliation." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008). In the Sixth Circuit, an employer will be liable for the coworker's actions if (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination; (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior; and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of

retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Id.* at 347.

Viewing the evidence in the light most favorable to Plaintiff, as we must at the summary judgment stage, Plaintiff has established a *prima facie* Title VII retaliation claim. Facing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. There is a genuine issue of fact regarding whether or not Plaintiff was subject to materially adverse action, and whether Plaintiff's protected activity (*i.e.*, formal and informal complaints to human resources and the EEOC) was the cause of such action.

In sum, the district court erred in dismissing Plaintiff's properly pled Title VII retaliation claim. When an employee alleges that an employer has both discriminated and retaliated against him in violation of Title VII, the district court must analyze these claims separately under Title VII, as the elements (and standards) for each claim are distinct. Moreover, notwithstanding the fact that both concern retaliation for protected activity and/or speech, the framework for analyzing a Title VII retaliation claim is distinct from the framework for analyzing a First Amendment retaliation claim.

## III.    First Amendment Retaliation Claim

Insofar as Plaintiff alleges that he is also entitled to First Amendment protection from retaliation for the Charges that he filed with the EEOC, we agree with the district court that Plaintiff's EEOC Charges were not entitled to First Amendment protection. However, as this Court reads the record and the briefs, the basis for Plaintiff's First Amendment retaliation claim is not the EEOC Charges, but rather the complaint that Plaintiff alleges he filed with the USDA regarding his co-worker Doug Deikman's sale of unregulated meat. Because the district court did not examine this issue, we will briefly analyze it on appeal.

To establish a *prima facie* case of First Amendment retaliation, a public employee must show that (1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse action against him that would deter an ordinary person from engaging in that conduct;

Case 1:11-cv-01061-JTN    ECF No. 111,  PageID.1025    Filed 03/13/14    Page 23 of 25

13-1640        *Laster v. City of Kalamazoo, et al.*                          Page 22

and (3) the protected speech was a substantial or motivating factor in the adverse action. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004).  To determine whether the first element is met, the Court undertakes a two-part inquiry, asking (1) whether the speech involved is a matter of public concern, and (2) whether the employee's interest in addressing these matters of public concern outweighs the interest of his employer "in promoting the efficiency of the public services it performs through its employees."  *Scarbrough*, 470 F.3d at 255.

Plaintiff alleges that his complaint to the USDA concerning Doug Deikman's sale of unregulated meat was protected speech.  As to this element, Plaintiff is correct.  However, Plaintiff cannot prevail on his First Amendment claim because there is absolutely no evidence in the record to indicate that Plaintiff actually complained to the USDA about the unregulated meat sales, that Defendants were aware that Plaintiff complained to the USDA, or that Plaintiff's complaint was the cause of any adverse action.  There is simply no genuine issue of material fact as to any of the elements alleged in Plaintiff's First Amendment retaliation claim.  Accordingly, the district court did not err in dismissing Plaintiff's First Amendment retaliation claim.

## CONCLUSION

Therefore, we **AFFIRM** the district court's dismissal of Plaintiff's state and federal race discrimination claims and First Amendment retaliation claim, **REVERSE** the district court's dismissal of Plaintiff's Title VII retaliation claim, and **REMAND** the case for further proceedings consistent with this judgment.

_____

**CONCURRENCE**

_____


ALICE M. BATCHELDER, Chief Judge, concurring**.**  In Count II of his first amended complaint, the plaintiff pled a Title VII retaliation claim that was distinct from his Title VII discrimination claim and his First Amendment retaliation claim.  The defendants moved for summary judgment on the discrimination claim and the First Amendment claim, which the district court granted, but did not challenge the Title VII retaliation claim.  Consequently, the district court did not address the Title VII retaliation claim in its opinion or judgment.

I agree with the lead opinion that we should remand this case to the district court for further proceedings on the Title VII retaliation claim.  But I do not agree that the district court analyzed this claim improperly – inasmuch as the district court did not analyze it at all – and I am leery of characterizing the facts and circumstances in a way that would limit the district court's plenary examination of a summary judgment motion on this claim on remand.

The lead opinion has rather thoroughly laid out the *McDonnell-Douglas* burden-shifting framework and – accepting all of the plaintiff's accusations as true – essentially determined that the plaintiff has made out his *prima facie* case.  Precisely because we must, at this stage, accept all of the plaintiff's allegations of fact as true, we may hold only that the plaintiff has demonstrated that there remain genuine issues of fact material to his claim that he suffered a material adverse action.  But we may not hold that he has established a *prima facie* case, particularly while also holding that material questions of fact remain in dispute as to that issue.

The *McDonnell-Douglas* framework has three stages.  Assuming the plaintiff has made out a *prima facie* case and satisfied the first stage, it might be that the defendants could satisfy the second stage (and third) and still obtain summary judgment.  I do not mean to opine on the likelihood of this, as I would leave that entirely to the district court on remand.

In summary, I agree with the entirety of the district court's well-written opinion.  The fact that the district court overlooked the Title VII retaliation claim, which the parties failed to bring to its attention, does not change my view.  But because I also agree that the plaintiff properly pled this claim, I join the judgment to remand for the district court to address it now.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 13-1640

MARK LASTER,

        Plaintiff-Appellant,

    v.

CITY OF KALAMAZOO, et al.,

        Defendants-Appellees.

```
┌─────────────────────────────┐
│          FILED              │
│        Mar 13, 2014         │
│     DEBORAH S. HUNT, Clerk  │
└─────────────────────────────┘
```

Before: BATCHELDER, Chief Judge; SILER and CLAY, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's dismissal of Plaintiff's state and federal race discrimination claims and First Amendment retaliation claim is AFFIRMED, the district court's dismissal of Plaintiff's Title VII retaliation claim is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this Court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk